## <u>AFFIDAVIT</u>

I, Matthew Langille, having been duly sworn, do hereby state:

1.      I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI") and have been so since August 2007.   As such, I am an investigative or law enforcement officer of the United States within the meaning 18 U.S.C. §2510(7), and an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. §2516.   I have been assigned to the Special Agent in Charge ("SAC"), New England since December 2011.   I am currently assigned to the Human Rights Violators and War Crimes National Security Unit and have been since 2018.   Prior to my current assignment I was assigned to the SAC in New York, NY.   Since joining HSI, my duties have included investigating criminal violations of Titles 18 and 21 of the United States Code, primarily those related to customs, immigration, and narcotics laws, to include, but not limited to, human rights violators and war criminals.   During the course of my employment with HSI, I have received training regarding the activities of human rights violators and war criminals, including identifying individual persons who have engaged in genocide, war crimes, and/or torture.   I have participated in all aspects of human rights violator and war crimes investigations, including interviewing witnesses and suspects, conducting surveillance, and reviewing documents, among other things.   I have also participated in the execution of numerous search warrants in residences and other locations seeking illegally obtained immigration or naturalization documents, documents reflecting identity, and other evidence of crimes.   I am familiar with the process by which refugees apply to come to the United States.   I

1

am also familiar with the process by which an alien obtains Lawful Permanent Resident ("LPR") status and adjusts status to become a United States citizen.

2.     I am submitting this Affidavit in support of an application for a criminal complaint charging ERIC TABARO NSHIMIYE, also known as "Eric Tabaro Nshimiyimana" ("NSHIMIYE"), with violations of: 18 U.S.C. §1623(a) (perjury); 18 U.S.C. §§ 1503 and 2 (Obstruction of Justice/Aiding and Abetting); and 18 U.S.C. §1001(a)(1) (falsifying, concealing, and covering up a material fact by trick, scheme, or device).

3.     The statements contained in this Affidavit are based on my own investigation, including interviews of victims, information provided to me by other law enforcement officials, information provided to me by experts and historians, and other sources.   This Affidavit is submitted for the limited purpose of establishing probable cause to conclude that NSHIMIYE committed violations of the statutes identified in the previous paragraph.   It therefore does not set forth all of the information that I and other law enforcement personnel have obtained during the course of this investigation.

<u>The Defendant</u>

4.     The defendant, Eric Nshimiye, also known as Eric Tabaro Nshimiyimana, was born and raised in the Republic of Rwanda ("Rwanda").   NSHIMIYE identified as a Hutu, a member of the majority ethnic group in the country, and was raised and obtained his early education in northern Rwanda in and about Ruhengeri.   NSHIMIYE attended the University of Rwanda in Butare (the "University") beginning in or about 1991 as an undergraduate medical

student.   NSHIMIYE was still enrolled at the University in April 1994 when the Rwandan genocide began.   NSHIMIYE fled Rwanda in 1994.

5.      NSHIMIYE applied to become a refugee to the United States in 1995 while he was living in Kenya.   His refugee application was granted that year, and he was admitted to the United States as a refugee in or about December 1995.   He became a lawful permanent resident of the United States in 1998.   He became a naturalized United States citizen in 2003.   He currently lives and works in Ohio.

<u>Background Information</u>

6.      At all times material to this Indictment, the Republic of Rwanda was a small country in Central Africa with a population of approximately 8 million people.   It was populated primarily by two main ethnic groups, the Hutu and the Tutsi.   Hutus accounted for approximately 85 percent of the population.   Tutsis accounted for approximately 14 percent of the population.   Following Rwanda's independence from Belgium in 1962, the Hutu majority gained control of the government, and engaged in acts, including discrimination and acts of violence, against Tutsis.   As a result, numerous Tutsis fled Rwanda and some formed a rebel guerilla army known as the Rwandan Patriotic Front ("RPF").

7.      In or about the early 1990s, the RPF invaded Rwanda from neighboring Uganda. Thereafter, Hutu President Juvenal Habyarimana executed agreements that called for a multi-party political system in which Hutus and Tutsis could share power. These agreements, which were negotiated between July 1992 and August 1993, were signed in Arusha, Tanzania, and came to be known as the "Arusha Accords."   Pursuant to the Arusha Accords, Habyarimana's

party, the Movement Revolutionaire National pour le Developpement ("MRND"), agreed to share power with several other parties, including those that represented Tutsis in the RPF.

8.     On or about April 6, 1994, the plane which was carrying President Habyarimana and Burundi's new President, was shot down as it approached the airport in Kigali, Rwanda's capital city.   President Habyarimana was killed in the crash.   This assassination precipitated a period of political and ethnic violence in Rwanda.   In particular, Hutu extremists with positions of power in an interim government formed after Habyarimana's assassination, called for the killing of prominent opposition figures, including Tutsis and moderate Hutu politicians. Included among those killed were government ministers opposed to the extremists.

9.     The killings spread throughout the country as Hutu soldiers, civilians, and militia -- including the youth militia of the MRND, known as the Interahamwe -- armed with machetes, clubs, guns and grenades, began killing Tutsi civilians.   At the time, most Rwandans carried identification cards specifying their ethnic background, a practice left over from the colonial period. These identification cards, known as "cartes d'identite," or "identity cards," which included information about the bearer, including whether they were classified as a Hutu or a Tutsi, now meant the difference between life and death.   Roadblocks where identity cards were checked were set up all over the country to intercept Tutsis, and Tutsis were attacked and killed wherever they fled and congregated, including at hospitals, churches, and schools.

10.     Hutu extremists engaged in genocidal mania using machetes and clubs to beat and hack to death thousands of Tutsis wherever they were found. A Rwandan radio station,

4

controlled by Hutu extremists, further encouraged the killings by broadcasting non-stop hate propaganda, and, at times, pinpointed the locations of Tutsis in hiding.

11.     The killings only ended after armed Tutsi RPF rebels managed to defeat the Hutu extremists and halt the genocide in July 1994. By then, approximately 800,000 men, women, and children had been killed.

12.     The prefecture of Butare, now known as Huye, located in the south of Rwanda, was the intellectual and cultural center of the country at the time of the genocide.   As compared to national demographics, Butare had a high percentage of Tutsis and a strong moderate and multi-ethnic political presence.   On or about April 17, 1994, the interim extremist Rwandan government removed the Tutsi governor in Butare.   Two days later, at a ceremony installing the new governor, the acting President of Rwanda, Theodore Sindikubwabo, delivered a speech in Butare urging Hutus in that part of the country, in well-understood coded terms, to exterminate Tutsis.   The day after, the killings accelerated in Butare with the use of roadblocks and other means to capture and kill Tutsis.   Members of the military, the Interahamwe, and others aligned with them, also sought out Tutsis in locations where Tutsis sought refuge, including medical facilities and government offices.   These measures resulted in the killing of scores Tutsis, and the rape of many Tutsi women.

13.     As the intellectual capital of Rwanda, Butare was not only the site of the University and its medical school, but also the Butare University Hospital ("the Hospital") affiliated with the University.   Tutsi students were killed at the University during the genocide in Butare.   Because many Tutsis sought refuge on the Hospital grounds, and also sought care for

5

their injuries there, the Hospital itself became the site of many atrocities.   Tutsi patients were

removed from the Hospital and then beaten or hacked to death.   Hospital nurses and other staff

who were Tutsi were also killed.   Tutsi women were often raped before they were killed.

<u>The Defendant's Membership in the MRND & Role in the Violence</u>

14.     While a student at the medical school of the University in Butare, NSHIMIYE

was an active member in the MRND and the Interahamwe.   Among other things, NSHIMIYE

wore a hat and clothing marked with MRND insignias and colors, and he participated in MRND

rallies and other MRND political gatherings.   NSHIMIYE also regularly associated with MRND

members, including Jean Leonard Teganya, who became a student leader of the MRND in

Butare.   Prior to the 1994 genocide, NSHIMIYE also participated in weapons training in the

forest adjacent to the university campus alongside other members of the MRND and

Interahamwe.



***Former Interahamwe Member Pointing to Location Where Nshimiye Trained with
Others in the Forest Adjacent to the University***

6

15.     After the genocide started in Butare, NSHIMIYE played an active role in the direct and indirect persecution of Tutsis.   Among other things, NSHIMIYE assisted in the identification of Tutsis among hospital patients and personnel; he searched for, and exposed, Tutsis sheltering at the hospital and other locations at the University and in Butare; and he assisted in the forcible removal of Tutsis from the hospital grounds, from locations at the University, and from other locations in Butare.

16.      NSHIMIYE also guarded several the roadblocks in Butare where he assisted in the identification and killing of Tutsis.   During much of this time, NSHIMIYE was armed with a wooden club spiked with nails and a machete.   At times, he was also armed with a hatchet and grenades.

17.     During the genocide, NSHIMIYE was also directly involved in the murder of Tutsis, including women and children, as well as the disposal of their dead bodies.   NSHIMIYE also encouraged, and aided and abetted, the rape of Tutsi women.

18.     Both persons who participated in the genocide as perpetrators, and survivors of the genocide, recently identified NSHIMIYE as among the most vicious University students who were members of the Interahamwe during the genocide.   For instance, one fellow perpetrator ("Witness 1"), recounted NSHIMIYE's use of a machete and spiked club to murder 14 year old Tutsi boy a short while after NSHIMIYE and others had killed his mother.   Witness 1 recounted another instance in which NSHIMIYE was with a group of Interahamwe who rounded up 25-30 Tutsis who had been hiding in the forest near the University.   The group, including NSHIMIYE and others, killed all of the captured Tutsis and then burned their bodies in the forest.



*Former Interahamwe Member Pointing Out the Location Where Nshimiye Killed the 14 year old Boy*

19.     Another fellow perpetrator ("Witness 2") recounted an instance in which NSHIMIYE instructed other members of the Interahamwe to rape and then kill six young women who were University students.   After giving these instructions, NSHIMIYE left the group. When NSHIMIYE returned sometime later he found that the young women were still alive. According to Witness 2, NSHIMIYE then selected one young woman to kill and assigned other Interahamwe to kill the remaining women.   NSHIMIYE killed the young woman by striking her in the head with a nail-studded club, and then hacking her to death.   Witness 2 also recounted an incident in which he saw NSHIMIYE capture a Tutsi tailor who made coats for doctors at the Hospital.   NSHIMIYE and others took the tailor away.   According to Witness 2, NSHIMIYE returned not long after, bragging that he had killed the tailor.   NSHIMIYE was carrying a blood soaked nail-spiked club.

 

**Two Witnesses' Drawings of the Nail-spiked Club Used by Nshimiye**

20.     A survivor of the genocide ("Witness 3") independently recounted seeing

NSHIMIYE and several Interahamwe take the tailor past a roadblock hear the Hospital entrance

and then beat and hack the tailor to death in a field adjacent to the Hospital entrance.

 

**The types of weapons used by members of the Interahamwe during the Rwandan Genocide**

9

21.     A female survivor ("Witness 4") recounted being raped repeatedly by NSHIMIYE and others during the genocide.   Witness 4 also recounted escaping from NSHIMIYE when he was taking her and two young children to one of the killing pits to be hacked to death.   The children did not survive.

<u>NSHIMIYE's Flight from Rwanda and Fraudulent Refugee Application</u>

22.     NSHIMIYE fled from Rwanda in 1994.   On or about May 10 and May 18, 1995, NSHIMIYE applied to become a refugee to the United States from Nairobi, Kenya. NSHIMIYE's own accounts of how he got from Rwanda to Kenya vary.   He claimed in his 1995 refugee application that he fled from Rwanda to Tanzania and then to Kenya.   By contrast, when he testified at a federal trial in 2019, he said he fled to "the DRC, Congo," and then to Kenya.   Notably, many Hutu genocidaires fled from Butare to the Democratic Republic of the Congo as the Tutsi RPF fought their way south through the country in the summer of 1994.

23.     On or about May 10 and May 18, 1995, in connection with his application for classification as a refugee to the United States, NSHIMIYE completed and signed a form titled, "Registration for Classification as a Refugee" (Form I-590).   In this and other related forms, NSHIMIYE falsely claimed, "I fled my country because I was threatened with my family to be killed by the militias INTERAHAMWE as they have killed my father during the massacres against the minority ethnic TUTSI."   NSHIMIYE also falsely claimed: 1) his place of birth was Kigali, Rwanda; 2) he left Rwanda on 4/15/1994; 3) he attended Lycée de Kigali from 1985-1991; and 4) he had not been in a "political, professional, or social organization" at any time prior to his refugee application.

24.     On or about May 18, 1995, NSHIMIYE also completed and signed a "Sworn Statement of Refugee Applying for Entry into the United States" (Form G-646T).   In that form, NSHIMIYE falsely swore that he had never committed a crime involving moral turpitude, and that he had "never ordered, assisted or otherwise participated in the persecution of any person because of race, religion or political opinion."

25.     On or about May 18, 1995, NSHIMIYE was asked a series of questions during an interview with a United States immigration official in Nairobi, Kenya.   In response to those questions, he falsely stated that he had not had "any involvement in the killing or injury to other persons since April 1, 1994," and that he did not, "in any way encourage others to participate in such killing or injury." He also falsely stated that his father was killed during the genocide.

26.     At the conclusion of the interview on or about May 18, 1995, and after a review of NSHIMIYE's completed Forms I-590 and G-646T, the immigration officer approved NSHIMIYE's application as a refugee.   In so doing, the immigration officer relied on NSHIMIYE's written and oral false statements.

27.     On or about December 1, 1995, NSHIMIYE was granted admission to the United States as a refugee and was also authorized to work in the United States.   NSHIMIYE entered the country at New York and took up residence in Ohio.

<u>NSHIMIYE's Fraudulent Application for Permanent Residency</u>

28.     On or about March 15, 1997, NSHIMIYE sought to become a lawful permanent resident of the United States.   On or about March 15, 1997, NSHIMIYE executed a Form I-485 in support of his application for lawful permanent residence.   In that Form I-485, NSHIMIYE

11

falsely claimed under penalty of perjury that: he had never "knowingly committed any crime of moral turpitude . . . for which [he had] not been arrested"; and that he had never "engaged in genocide, or otherwise ordered, incited, assisted or otherwise participated in the killing of any person because of race, religion, nationality, ethnic origin, or political opinion."  NSHIMIYE also concealed the fact that he had been a member of the MRND and the Interahamwe when asked to list, "present and past membership in or affiliation with every political organization, association . . party, club, society or similar group. . . since your 16th birthday."

29.     NSHIMIYE's application for lawful permanent residence was approved on or about May 7, 1998, based in part on his false statements, and his continued concealment of his role during the Rwandan genocide. NSHIMIYE's lawful permanent residence status was applied retroactively to his original admission date of December 1, 1995.

<u>NSHIMIYE's Fraudulent Application for U.S. Citizenship</u>

30.     In September 2001, NSHIMIYE sought to become a United States citizen.   On or about September 11, 2001, NSHIMIYE executed a Form N-400 in connection with his application to be a U.S. citizen.   On that form, NSHIMIYE falsely declared under penalty of perjury that: he had never persecuted (either directly or indirectly) any person because of race, religion, national origin, membership in a particular social group, or political opinion (No.11); he had never committed a crime or offense for which he had not been arrested (No.15);   he had never given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent his exclusion from the United States (No.23);   and he had never lied to any U.S. government official to gain entry or admission into the United States

12

(No.24). He also concealed his membership in the MRND and in the Interahamwe when asked if he had ever been a member of or associated with any organization, association, party, club, or similar group (No.8).

31. On or about December 12, 2002, NSHIMIYE appeared before a United States immigration officer, and again swore to the contents of the Form N-400, including those false statements set forth in the previous paragraph. Based in part on NSHIMIYE's false statements and his continued concealment of his role during the Rwandan genocide, NSHIMIYE's Application for Naturalization was approved on December 13, 2002. NSHIMIYE was naturalized as a United States citizen on or about April 18, 2003, and was issued a Department of Homeland Security Certificate of Naturalization.

NSHIMIYE's Perjury and Obstruction of Justice
at a Federal Criminal Trial

32. On or about September 27, 2017, a Grand Jury of the United States District Court for the District of Massachusetts indicted NSHIMIYE's former University classmate and roommate, Jean Leonard Teganya, in a five count indictment. Teganya was charged with fraud and misuse of visas, permits, and other documents in violation of 18 U.S.C. §1546(a), and with perjury in violation of 18 U.S.C. §§ 1621(1) and (2). The indictment alleged that in seeking asylum in the United States, Teganya had failed to disclose that he was a member of the MRND, and also falsely stated that he had never participated in causing harm to another person because of that person's race, religion, nationality, membership in a particular social group, or belief in a particular political opinion. It also alleged that Teganya had testified falsely during an

immigration custody hearing, claiming he had not been a member of the MRND, and he had never witnessed any atrocities occur at the Hospital during the genocide.

33.     In or about March and April 2019, Teganya was tried before a jury in the United States District Court for the District of Massachusetts.   His case was captioned *United States v. Jean Leonard Teganya*, 1:17-cr-10292-FDS.   NSHIMIYE, who had been one of Teganya's closest friends and associates at the University before and during the genocide in 1994, was called by Teganya to testify on Teganya's behalf.   NSHIMIYE testified before the jury on or about April 2, 2019.

34.     As set forth below, after swearing an oath to tell the truth, NSHIMIYE testified falsely about Teganya's association with the MRND, seeking to falsely exculpate Teganya. NSHIMIYE also testified falsely about his own membership in the MRND and the Interahamwe, and his participation in the Rwandan genocide, among other things.   In so doing, NSHIMIYE aided and abetted Teganya's endeavor to obstruct justice, as Teganya was fully aware that NSHIMIYE would lie to exculpate him.   Moreover, NSHIMIYE engaged in obstruction of justice himself, by assisting Teganya, and seeking to prevent or derail a federal law enforcement investigation of his own activities during the genocide and his fraudulent scheme to enter the United States as a refugee and ultimately become a United States citizen.

35.     Among NSHIMIYE's perjurious statements under oath on direct examination by defense counsel at trial are the following:

> Q.     I'm going to approach and show you a couple of items, just ask if you recognize them. First, I'm showing you a hat marked Exhibit 12. I ask you to look at that and tell me if you recognize that style of hat.

14

A.      <u>I don't remember this type of hat</u>.

Q.      I'm also going to show you another item that's been marked Exhibit 15. It's a scarf. Do you recognize what this is?

A:      <u>No</u>.

Q.      Were you yourself a member of a political party as a university student?

A.      <u>Never</u>.

Q.      Did you ever see a hat like that being worn by Mr. Teganya?

A.      <u>No.</u>

Q.      Did you ever see a scarf like that being worn by Mr. Teganya?

A.      <u>No.</u>

Q.      Did Mr. Teganya have a hat or a scarf like that in the room that you shared?

A.      <u>No.</u>

Q.      Did Mr. Teganya have any sort of flag displayed in his room?

A.      No.

Q.      To the best of your knowledge, did Mr. Teganya go to any political meetings or rallies?

A.      <u>Not that I know of</u>.

. . .

Q.      Were you able to go back to Butare after the president's plane was shot down?

15

A.      No.

Q.      Did you spend any time in Butare during the genocide?

A.      No.

36.      Among NSHIMIYE's perjurious statements on cross-examination by the

prosecution are the following:

Q.      In fact, you were a member of MRND; isn't that correct?

A.      No.

Q.      You wore that hat?

A.      No.

Q.      You wore that scarf?

A.      No.

Q.      You testified on direct you don't even remember it, but, in fact, you wore
        it; isn't that correct?

A.      No.

Q.      You wore the pins as well?

A.      No.

Q.      You attended rallies and parties and meetings?

A.      No, never.

Q.      And you were a member of the Interahamwe?

A.      No.

Q.      You attended trainings with Mr. Teganya at the gym and in the forest?

A.      No; hell, no.

. . .

16

Q.     And then you were there at the Kiza dorm with Mr. Teganya when four Tutsi students were taken out and killed?

A.     No, I was not in Butare.

Q.     And you participated in that killing of those students?

A.     No, I was not in Butare.

Q.     Sir, I remind you you're under oath for these answers.

A.     I was in Kigali, then I managed to get back to Ruhengeri.

Q.     So your answer is no, that you didn't participate in the genocide?

A.     No.

Q.     Is there any context you'd like to add to that?

A.     No.

37.     Eyewitnesses in Rwanda – including former classmates at the University, former workers at the Hospital, former perpetrators, fellow Interahamwe members, and survivors -- have independently told me during interviews that: NSHIMIYE and Teganya were close friends at the University and Hospital, shared a room in a group house in Butare, and were frequently seen together before the genocide and during the genocide in Butare; NSHIMIYE and Teganya were widely known members of the MRND at the University and Hospital prior to the genocide and regularly wore MRND attire including the MRND hat, scarf and other MRND items; prior to the genocide NSHIMIYE and Teganya regularly attended MRND meetings and rallies, almost always together; prior to the genocide NSHIMIYE and Teganya participated in Interahamwe combat training in the forest adjacent to the University in the evenings; and NSHIMIYE and

17

Teganya were present in Butare during the genocide and were both directly and indirectly involved in the persecution of Tutsis.

<u>NSHIMIYE Persists in Providing False Information to Homeland Security Agents</u>

38. On March 11, 2024, I met with NSHIMIYE at his workplace in Akron, Ohio. I audio-recorded the meeting. I asked him a number of questions about how he came to the United States, how he survived the genocide, his political affiliation prior to the genocide, whether he had been a member of the MRND, whether he had been a member of the Interahamwe, and whether he had been at the University in Butare during the genocide. NSHIMIYE persisted in concealing his prior membership in the MRND and the Interahamwe, falsely claiming that he had no political affiliation prior to the genocide. He also specifically said he had not been a member of the MRND or the Interahamwe, and he had never attended political rallies. NSHIMIYE also falsely denied being in Butare during the genocide, falsely claiming to have left Rwanda shortly after the President's airplane was shot down. When ultimately asked if he had been involved in raping or killing anyone during the genocide, NSHIMIYE first responded by shaking his head, laughing nervously, and asking for a drink of water. When I persisted by asking again, he falsely denied any involvement in raping or killing anyone during the genocide.

**<u>Conclusion</u>**

39. On the basis of the foregoing information, there is probable cause to conclude that ERIC TABARO NSHIMIYE a/k/a Eric Tabaro Nshimiyimana did: (1) on or about April 2, 2019,

having taken an oath to testify truthfully in a proceeding before the United States District Court

for the District of Massachusetts, knowingly make false material declarations as set forth above,

during his trial testimony in *United States v. Jean Leonard Teganya*, 1:17-cr-10292-FDS, in

violation of 18 U.S.C. §1623(a); (2) on or about April 2, 2019, did corruptly influence, obstruct

and impede, and endeavor to influence, obstruct and impede the due administration of justice in

*United States v. Jean Leonard Teganya*, 1:17-cr-10292-FDS, in the United States District Court

for the District of Massachusetts, and did aid and abet Jean Leonard Teganya in the commission

of such a crime, in violation of 18 U.S.C. §§1503 and 2; and (3) through on or about May 10,

1995, and continuing through on or about March 11, 2024, knowingly and willfully falsify,

conceal, and cover up by trick, scheme, and device one or more material facts in a matter within

the jurisdiction of the executive and judicial branches of the Government of the United States, in

that he, as an applicant to become a refugee for admission into the United States, as an applicant

for lawful permanent residence in the United States, as an applicant for United States citizenship,

in response to questions posed to him under oath at trial in *United States v. Jean Leonard

Teganya*, 1:17-cr-10292-FDS, concealed the following material facts, and in response to

questions asked of him by special agents of the Department of Homeland Security on March 11,

2024: 1) he had been a member of the MRND before and during the Rwandan genocide in 1994;

2) he was present in Butare (a/k/a Huye), Rwanda during a portion of the genocide and witnessed

genocidal acts by persons known to him; and 3) he participated in the direct and indirect

persecution of one or more persons because of race, religion, national origin, membership in a

particular social group, and political opinion prior to seeking refuge in the United States, in violation of 18 U.S.C. §1001(a)(1).

_Matthew Langille_ Dcc
MATTHEW LANGILLE
Special Agent
Homeland Security Investigations

Sworn to me through the transmission of this Affidavit by reliable electronic and telephonic means, pursuant to Federal Rules of Criminal Procedure 41(d)(3) and/or 4.1, this 15th day of March, 2024.

HON. DONALD L. CABELL
CHIEF UNITED STATES MAGISTRATE JUDGE

20